**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**Kary  R. Estabrook**

   v.                                      Case No. 13-cv-478-PB
                                        Opinion No. 2014 DNH 222
**Carolyn Colvin,**
**Acting Commissioner,**
**Social Security Administration**


**MEMORANDUM AND ORDER**


   Kary Estabrook seeks judicial review of a ruling by the

Social Security Administration denying her application for

disability insurance benefits ("DIB") and supplemental security

income ("SSI").  For the reasons set forth below, I deny

Estabrook's request and affirm the decision of the Commissioner.


**I.    BACKGROUND[1]**

   On August 5, 2010, Estabrook applied for DIB and SSI.  At

that time, she was 38 years old and working part time as a

technician for a pest control company.  Estabrook alleges that

beginning around May 1, 2010, she became disabled.  She states

---

[1] Sections A, B, and C of the background section are taken
verbatim from the parties' joint statement of material facts
(Doc. No. 12).  See L.R. 9.1(b).  Minor stylistic changes have
been made, citations to the administrative transcript have been
omitted, and headings and medical definitions have been added.

that her impairments stem from lupus, neuropathy in her legs,
and degenerative disc disease, as well as other mental and
physical impairments.

**A.**  **Medical Evidence**

> **1.**  Physical Impairment

> > **a.  Dr. Guiry**

Plaintiff treated with primary care physician Colleen Guiry,
M.D.  Dr. Guiry's records indicate that she treated plaintiff for:
(1) systemic lupus erythematosus (lupus),[2] starting July 2, 2010;
(2) back pain, starting June 28, 2010; (3) chest pain, starting May
18, 2010; (4) a tick bite, on May 11, 2010; (5) nausea, starting
May 10, 2010; (6) joint pain, starting May 10, 2010; and (7) asthma
and pleurisy,[3] starting on March 14, 2009.  After a tick bite,
plaintiff went to the emergency room on May 7, 2010, complaining of
lower back pain, abdominal cramping, tingling and burning in the
legs, a general feeling of fatigue, and difficulty focusing.  She
had blood work to evaluate for Lyme disease and was prescribed
antibiotics as a precaution.  Plaintiff saw Dr. Guiry on May 10,

---

[2] Systemic lupus erythematosus is a chronic, inflammatory multi-systemic disorder of connective tissue that proceeds through remissions and relapses and is characterized by involvement of the skin, joints, kidneys, and serosal membranes.  Dorland's Illustrated Medical Dictionary 1080 (32nd ed. 2012).

[3] Pleurisy is inflammation of the pleura, the membrane surrounding the lungs and lining of the chest cavity. Dorland's, supra note 2, at 1460-61.

2010, after her evaluation for Lyme disease in the emergency room, as she was still experiencing nausea and body aches.  Plaintiff was advised to return to the hospital for additional blood work for other tick-borne diseases and rheumatologic conditions that could cause the sudden onset of joint pain.

Plaintiff saw Dr. Guiry on May 18, 2010 for chest pain and joint pain, which she reported at a pain level of two out of ten when she took Aleve and six out of ten at its worst.  Dr. Guiry prescribed diclofenac sodium[4] and ordered a chest x-ray.  The chest x-ray was negative for acute cardiac or pulmonary pathology. Plaintiff contacted her primary care office on May 28, 2010 to ask for a note for her employer so she could begin an every-other-day work schedule, as she was not getting relief from her joint pain. Dr. Guiry's office prescribed Tramadol[5] for her pain on June 14, 2010, until she was able to see John Gorman, M.D., the rheumatologist.

Plaintiff went to the emergency room on June 27, 2010, for a possible lupus flare-up.  She was experiencing increased pains in her back, joints, legs, and arms.  The emergency room physician,

---

[4] Diclofenac sodium is used in the treatment of rheumatoid arthritis and other inflammatory conditions.  Dorland's, supra note 2, at 513.

[5] Tramadol is an opioid analgesic used to treat moderate to moderately severe pain.  Dorland's, supra note 2, at 1950.

3

Brian Miller, D.O., prescribed Percocet[6] for the pain and
recommended that plaintiff follow-up with her rheumatologist, Dr.
Gorman, or with Dr. Guiry to discuss steroids as a course of
treatment.  Plaintiff was seen at Dr. Guiry's office on June 28,
2010, complaining of pain in her back and feet.  She informed
Jennifer Thebodeau, M.A., of her possible lupus diagnosis.
Plaintiff stated the medication Dr. Gorman prescribed, Plaquenil,[7]
could take months to work.  Plaintiff reported she was in too much
pain to work and requested a note saying she could not work at all
so that she could "get disability or [asked the doctor to give her]
something to take away the pain so that she c[ould] work."
Thebodeau suggested x-rays of the back, to see if plaintiff's pain
had another origin.  The x-ray of the lumbar spine was negative,
showing a normal alignment and no degenerative changes.

    Plaintiff saw Dr. Guiry on July 2, 2010, for follow-up after
her possible lupus diagnosis.  Plaintiff reported that her pain was
not better and she had pain in her upper back, chest, legs, hips,
ankles, and on her left side with radiation to the left arm; the
record notes plaintiff had the left side pain for years.  No new
recommendations were given and plaintiff was told to follow-up with

_____

[6] Percocet is indicated for the relief of moderate to moderately
severe pain.  Physician's Desk Reference 1245 (58th ed. 2004).
[7] Plaquenil is the trade name for hydroxychloroquine sulfate, an
anti-inflammatory used to treat lupus.  Dorland's, supra note 2,
at 881, 1456.

Dr. Gorman.  Plaintiff saw Dr. Guiry on July 20, 2010 for an acute visit, due to the pain on the left side of her chest and numbness of the left arm.  Plaintiff reported that she had not taken anything for the pain, including the Diclofenac, which Dr. Guiry previously prescribed to her.  Dr. Guiry scheduled an echocardiogram and urged Plaintiff to quit smoking.[8]  Plaintiff's echocardiogram on July 23, 2010 demonstrated normal heart function and structure.

     **b.  Dr. Gorman**

Plaintiff began seeing Dr. Gorman on June 24, 2010.  Plaintiff reported pain in the lower back, hips, and knees, swelling of the knees and ankles, frequent nasal ulcers, dry mouth, pleurisy, facial rash with sun exposure, and discomfort in her fingers when exposed to cold.  Dr. Gorman reported that plaintiff's blood work was positive for antinuclear antibodies[9] and a number of her symptoms were consistent with lupus.  Dr. Gorman recommended plaintiff have further studies done to detect antibodies and prescribed Hydroxychloroquine ("HCQ").[10]

---

[8] Plaintiff's records indicate she smokes between one and one and a half packs of cigarettes per day.

[9] These are antibodies directed against nuclear antigens and are usually found in individuals with lupus.  Dorland's, supra note 2, at 101.

[10] HCQ is an anti-inflammatory used to suppress lupus. Dorland's, supra note 2, at 881.

Plaintiff saw Dr. Gorman for follow-up on August 5, 2010.  The doctor stated that plaintiff was tolerating HCQ well but still had considerable generalized pain, her pleurisy was not improved, and her energy was a little diminished.  Dr. Gorman opined that plaintiff's lab data was not completely supportive of a lupus diagnosis, but he was still concerned given her other symptoms.  The doctor questioned whether plaintiff's chronic pain could be from a different musculoskeletal pain condition.  He prescribed Prednisone,[11] to taper over a 12-day period.

Plaintiff saw Dr. Gorman on August 17, 2010, the day after completing her Prednisone taper.  Plaintiff reported that the medication helped her pain significantly the first three days, but her pain returned as the dose decreased.  The Prednisone did eliminate her rash, mouth ulcers, and pleurisy, which had not returned.  Dr. Gorman noted that plaintiff was "[s]till very achy," but concluded that her suspected lupus was "a little improved."

On September 28, 2010, plaintiff reported to Dr. Gorman that she still had pain in her lower lumbar area radiating into her buttocks and legs.  Plaintiff believed the HCQ was controlling her rash, mouth ulcers, and pleurisy.  On examination, plaintiff had no fibromyalgia tender points or joint swelling or tenderness, but did

---

[11] Prednisone is an anti-inflammatory or immunosuppressant used in a wide variety of disorders.  Dorland's, supra note 2, at 1509.

have mild lower lumbar tenderness.  Dr. Gorman opined that

plaintiff had a lumbar strain and recommended physical therapy.[12]

### c.   Dr. Couture

On March 21, 2011, plaintiff was referred to Christopher

Couture, M.D., a sports medicine specialist, by Gary Fleischer,

M.D., to treat her lower back pain and a bulging disk.  Plaintiff's

MRI showed a "slightly desiccated disc and annular tear at L4-5,"

but Dr. Fleischer did not think this was the cause of her symptoms.

Plaintiff also had an electromyogram,[13] which showed

polyneuropathy,[14] with no evidence of lumbar radiculopathy,[15] which

was being treated with Gabapentin.[16]  Dr. Couture opined that

---

[12] Plaintiff saw Dr. Gorman on October 19, 2010 for the urgent
evaluation of a rash, but the doctor found that the rash was
dermatitis with an unknown origin, not related to lupus.

[13] An electromyogram is a study to show the activity of skeletal
muscles at rest, during contraction, and during electrical
stimulation.  Dorland's, supra note 2, at 602.

[14] Polyneuropathy is the functional disturbance or pathological
change in the peripheral nervous system, affecting several
nerves.  Dorland's, supra note 2, at 1268, 1491.

[15] Radiculopathy is a disease of the nerve roots, such as from
inflammation or impingement by a tumor or bony spur.  Dorland's,
supra note 2, at 1571.

[16] Gabapentin is an anticonvulsant that is used as adjunctive
therapy in the treatment of partial seizures.  Dorland's, supra
note 2, at 759.  Plaintiff had a follow-up neurology appointment
with Andreja Packard, M.D., Ph.D., on November 28, 2011, and the
doctor stated that plaintiff was doing "really well with daily
[G]abapentin therapy [and plaintiff had] no sensory symptoms
[and] reported no discomfort."

plaintiff had an iliolumbar ligament sprain and gave her an injection of an anti-inflammatory steroid.  Physical therapy was recommended to treat plaintiff's iliolumbar ligament and neuropathy pain.[17]

Plaintiff returned to Dr. Couture on May 2, 2011, as her back pain had started to return in the previous two weeks.  Plaintiff reported that her back pain was relieved for about four weeks after her last visit and the steroid injection.  Plaintiff stated that her physical therapy was going well overall; she saw the physical therapist about once a week and supplemented with at home exercises.  Plaintiff received an autologous blood injection in the left iliolumbar ligament and experienced immediate relief of her pain.  Plaintiff followed up with Dr. Couture on June 8, 2011, and reported she was going "quite a bit better[,] . . . still getting episodes of pain about once or twice a week but [not] nearly the frequency or intensity as before starting physical therapy."  Plaintiff received a second autologous blood injection at the left iliolumbar ligament and again experienced immediate improvement in her pain.  Plaintiff received a third and fourth injection with similar results on July 13, 2011 and August 17, 2011.

On September 15, 2011, Plaintiff returned to Dr. Couture

---

[17] Plaintiff received physical therapy at Elite Rehab & Sports Therapy from March 28, 2011 through October 26, 2011.

because the pain in her lower back had returned, after being out of physical therapy and relatively inactive.  Plaintiff's sacroiliac joints on both sides were tender to touch.  Plaintiff was advised to resume physical therapy and she received cortisone injections in each of her sacroiliac joints, experiencing immediate relief of fifty percent of her pain.  Plaintiff saw Dr. Couture on October 11, 2011 to follow-up after her sacroiliac joint injections. Plaintiff reported that her pain had improved but she still had "good days and bad days."  The doctor opined that plaintiff was symptomatically improved and should transition from physical therapy to an independent home exercise program.

### d.   Dr. Fairley

Hugh Fairley, M.D., a state Disability Determination Services ("DDS") consultant and family medicine specialist, evaluated plaintiff's physical residual functional capacity ("RFC") on November 23, 2010.  As to exertional limitations, he opined that plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand or walk for 6 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, and push and/or pull without limitation, except those described for lifting and carrying.  Dr. Fairley stated that Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl.  He also stated that

plaintiff had no manipulative, visual, or communicative limitations, but should avoid hazards.

### e.   Application to City of Nashua Welfare Department

Plaintiff applied to the City of Nashua Welfare Department for financial assistance on April 21, 2011.  Dr. Guiry completed a statement of plaintiff's capabilities on November 10, 2010, which was submitted with her application.  Dr. Guiry reported plaintiff's diagnosis of lupus, with a prognosis of "fair," and stated that plaintiff had been in pain for seven months and it was not clear when she would respond to medication.  Dr. Guiry opined that plaintiff could perform sedentary activities, including frequent sitting or occasional standing or walking, such as classroom situations, desk work, counseling sessions, or other appointments. Dr. Guiry also noted that, depending on the day, plaintiff could perform light work activities.  The doctor reported that plaintiff could sit, stand, or walk for one hour per day, but that she needs to change position every 20 to 30 minutes.  Dr. Guiry stated that plaintiff could occasionally: lift and carry up to 20 pounds, kneel, bend from the waist, crouch, climb stairs, climb ladders or scaffolds, crawl, reach above shoulder level, twist at the waist, use both hands for simple grasping, fine manipulation, and pushing and pulling, and use both feet.  She stated that plaintiff should also avoid fumes or dust, hard floors, extreme cold and heat,

hazardous areas, and outside terrain.  Dr. Guiry's ultimate opinion
was that plaintiff was not capable of participating in work-related
activities at that time.

Dr. Guiry completed a second evaluation of plaintiff's
physical capabilities on April 21, 2011, which was also submitted
with her welfare application.  This evaluation was substantially
the same as the November 2010 evaluation, except that in addition
to plaintiff's lupus, Dr. Guiry listed degenerative disc disease
and neuropathy as diagnoses.  Plaintiff's prognosis was again
reported as "fair" and Dr. Guiry again noted that Plaintiff could
perform sedentary work or light work, depending on the day.  Her
exertional and non-exertional limitation findings were the same as
the prior report and she again concluded that plaintiff was unable
to perform work-related activities.

On December 16, 2011, Dr. Guiry completed a medical opinion
form describing Plaintiff's ability to engage in physical
activities.  She listed plaintiff's diagnoses as sacroiliac joint
dysfunction, polyneuropathy, headache, pleurisy, and probable
lupus, all with a prognosis of fair.  Dr. Guiry opined that
plaintiff could walk eight blocks without rest, sit and stand for
30 minutes at one time, and "sit" and "stand/walk" for four non-
continuous hours each in an eight-hour workday.[18]  Dr. Guiry stated

---

[18] In the joint statement of material facts, the parties stated

11

that plaintiff needs a job where she can shift positions at will, will need to take unscheduled breaks every hour during an eight-hour workday, and will need to stop to rest for the remainder of the day after working one-to-two hours.  The doctor opined that plaintiff could frequently lift less than 10 pounds and occasionally lift 10 to 20 pounds, had significant limitations in repetitive reaching, handling, or fingering, and could bend and twist very little due to her pain.  Dr. Guiry stated that plaintiff should avoid exposure to extreme cold, fumes, odors, dusts, gases, perfumes, cigarette smoke, solvents and cleaners, and chemicals. She also stated that plaintiff should never stand or crouch and could occasionally twist and climb stairs and ladders.  Finally, she opined that plaintiff's impairments cause good days and bad days and she would be absent from work more than twice a month because of her impairments and/or treatments.

2.   Mental Impairment

On August 24, 2011, plaintiff began therapy with Miriam Dunn,

---

that Dr. Guiry's December 16, 2011 opinion stated that Estabrook could "sit and stand or walk for a total of 4 non-continuous hours in an 8-hour workday."  Doc. No. 12 at 9.  I have clarified this sentence, however, to reflect Dr. Guiry's opinion form, which indicates that Estabrook could "sit" four approximately four hours each day and "stand/walk" for approximately four hours each day.  The ALJ's opinion also reflects the latter understanding of Dr. Guiry's opinion.

M.A., L.M.H.[19]  At her first appointment, plaintiff discussed the
onset of her symptoms and the diagnosis of lupus, her difficulty in
sharing her feelings, and her frustration in being unable to do
things she used to do.  Plaintiff had twenty visits with Dunn
between August 24, 2011 and March 14, 2012.  Plaintiff discussed
her fears and frustrations concerning her physical symptoms and
limitations, including her bladder issues, fatigue, an inability to
maintain an active lifestyle, an inability to provide for her
family, pain, and memory issues.  Plaintiff also reported stress at
home and problems with her stepdaughter.  In plaintiff's later
appointments, she stressed her fatigue.  She also indicated that
she was in pain and needed to take naps to try to stay relaxed and
to try to have good days.

     In connection with plaintiff's application to the City of
Nashua for welfare, Dr. Guiry submitted an evaluation of
plaintiff's psychological capacities.  Dr. Guiry reported that
plaintiff did not have any diagnoses of a mental condition and
that she did not take any medications that would affect her work
capabilities.  Dr. Guiry opined that plaintiff's abilities were
not limited in interacting appropriately with others,
maintaining socially acceptable behavior, asking questions or

---

[19] Plaintiff's primary care physician prescribed Citalopram on
August 6, 2011 for depression.

requesting assistance, adhering to basic standards of neatness
and hygiene, being aware of hazards and taking precautions,
remembering locations and work-like procedures, understanding
and remembering short, simple instructions, maintaining
attention for extended periods of time, sustaining a routine
without frequent supervision, making simple work-related
decisions, performing at a consistent pace, and driving.  Dr.
Guiry's ultimate conclusion remained that plaintiff was not
capable of performing work-related activities at this time.

On December 7, 2011, Dunn completed a "Medical Opinion
Questionnaire" related to plaintiff's mental impairments.  Dunn
listed a diagnosis of "300.02 Anxiety due to illness," which she
noted would continue to be an issue as plaintiff has lupus, a
lifelong condition.  Dunn opined that plaintiff has a poor
ability to: (1) travel in an unfamiliar place; (2) use public
transportation; (3) remember work-like procedures because of
issues with memory; (4) understand, remember, and carry out very
short and simple instructions; (5) maintain attention for a two-
hour segment; (6) work in coordination with or proximity to
others without being unduly distracted; (7) complete a normal
workday or workweek without interruptions from psychologically
based symptoms; (8) perform at a consistent pace without an

14

unreasonable number and length of rest periods; (9) deal with normal work stress; (10) understand, remember, and carry out detailed instructions; (11) set realistic goals or make plans independently of others; and (12) deal with the stress of semiskilled and skilled work.  Dunn found that plaintiff's ability to maintain regular attendance at work, be punctual at work, and sustain an ordinary routine at work without supervision would be unpredictable due to her lupus.  Dunn found that plaintiff would have a fair ability to ask simple questions or request assistance and to accept instructions and respond appropriately to criticism from supervisors, depending on her medication.  Finally, Dunn found that plaintiff would have a very good ability to adhere to basic standards of neatness and cleanliness and a good ability to: (1) interact appropriately with the general public; (2) maintain socially appropriate behavior; (3) get along with co-workers without unduly distracting them or exhibiting behavioral extremes; (4) respond appropriately to changes in a routine work setting; and (5) be aware of normal hazards and take appropriate precautions. Dunn stated that plaintiff's impairments or treatment would cause her to be absent from work more than twice a month.

**B.   <u>Non-Medical Evidence</u>**

    1.   <u>Plaintiff's Disability Application and Function Report</u>

    Plaintiff reported in her disability application that the

physical and mental conditions limiting her ability to work were lupus, rheumatoid arthritis, and asthma.  She also reported that she was "currently working" as a technician for a pest control company, but her conditions had caused her to make changes in her work activity on June 1, 2010.  Plaintiff listed her only medications as HCQ and prednisolone acetate,[20] both prescribed for her lupus by Dr. Gorman.  At the time of her application, plaintiff reported that she had not seen a doctor or received treatment for any mental conditions.

In plaintiff's function report, she stated that her pain was "moderate to bad" four to six days a week.  On days when plaintiff's pain was bad, she reported that she stayed in bed and on days when her pain was moderate, she reported that she played with her stepchildren and did minor cleaning around the house.  On days when her pain was low, plaintiff said that she could go to work.

Plaintiff reported that she purchased food for and fed her dog, but the dog was temporarily staying with her parents until she found a place to live.  Plaintiff stated that her wife walked the dog and prepared most of the meals for the family. Plaintiff said that she had a hard time falling asleep or

---

[20] Given as a soft-tissue injection, Prednisolone acetate is an anti-inflammatory and immunosuppressant used to treat a wide variety of disorders.  Dorland's, supra note 2, at 1508.

staying asleep because of her pain.  Plaintiff did not need any
reminders to take of personal needs, grooming, or to take
medications.  She was able to dress, bathe, care for her hair,
shave, feed herself, and use the toilet without effect from her
impairments.

Plaintiff stated that her wife prepared most meals, but she
"c[ould] do most things" and would pick simple things to make if
her pain was bad.  She reported that it took her a normal amount
of time to prepare a meal if she needed to.  Plaintiff was able
to do some cleaning and take out the trash, when her pain level
was "ok," but she reported that she did not do these chores
"very often right now."  Plaintiff reported that she did not do
yard work because she was renting and her landlord did most of
that work.

When plaintiff went out, she stated it was to do errands
and to go to work, when she could.  Plaintiff reported that she
drove a car and was able to go out alone, but she usually drove
for work only.  She stated that she went to the store for food
shopping.  She was able to pay bills, count change, handle a
savings account, and use a checkbook.  Plaintiff said that her
ability to play with her kids was minimal now and that she could
not be physical due to her pain and swelling.

Plaintiff stated that she spent time talking and watching TV and movies with her children.  She also talked with customers when she worked.  Plaintiff reported that the places she went regularly were to doctor's visits and counseling for her stepdaughter.  Plaintiff said that she had problems getting along with family and friends because "there [we]re days [when she was] down on what is going on with [herself] and [her] illness [and she] [got] frustrated easy and either cr[ied] or overreact[ed]."

Plaintiff reported that the following abilities were affected by her conditions: lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, concentrating, and getting along with others.  Plaintiff stated that her ability to sit, talk, hear, see, complete tasks, understand, and follow instructions, as well as her memory and the use of her hands, were not affected by her condition.  She said that her limitations were based on her pain level and some of the limitations would vary, depending on whether she needed to perform several of the exertions at the same time.  Plaintiff said that she could walk for up to 30 minutes depending on her pain level.  Plaintiff could finish what she starts, follow written and oral instructions, get along well with authority

figures, handle changes in routine "ok," and had never been
fired from a job.

Plaintiff stated that she could typically handle stress well
but now stress caused her more pain, exhausted her, and would make
her want to cry a lot.  Plaintiff reported that she was "very
withdrawn" and had more problems dealing with things that bother
her.  Plaintiff said that she did not get pain relief from her
lupus medication, although she was trying HCQ to try to reduce her
pain.  Plaintiff reported that she did not have the financial means
to support herself or her stepchildren because she could barely
work.

2.   Plaintiff's Work Activity and Work History Reports

Plaintiff completed a work activity report on August 10,
2010.  She alleged a disability onset date of May 1, 2010.  She
also reported that she worked forty hours per week at JP Pest in
Milford, New Hampshire through June 2010 and had worked 10 to 20
hours per week between June and August.  Plaintiff reported that
she was given special work conditions at JP Pest and worked
irregular hours or took frequent rest periods and had different,
fewer, or easier duties.

In her work history report, plaintiff described her past
work as a fast-food manager, where she worked from 2006 to 2007.
Plaintiff worked ten hours per day, five days a week.  She

19

described her duties as running shifts, counting drawers, serving and making food, valuing trucks, and all other manager duties.  As a manager, she used machines, tools, or equipment, used technical knowledge or skills, wrote and completed reports, was standing or walking eight to ten hours a day, frequently lifted ten pounds, supervised up to eight people a day, hired and fired employees, and was a lead worker.  In her job at the pest control company, plaintiff stated that, as of August 2010, she worked two hours a day, five days a week.  She reported that her hours and duties had changed due to her condition.

On December 3, 2010, DDS examiner Joanne Degnan determined that plaintiff had the RFC to perform light work, with occasional postural activities, and should avoid heights.  She opined that plaintiff could return to her previous work as a food service manager, which, when performed in the national economy, is considered light.

### 3.   Plaintiff's Testimony

At her administrative hearing, Plaintiff testified that she lived in an apartment with her wife, their son, and her brother. The last job she performed was pest control at JP Pest, where she had worked for two and half years.  Plaintiff testified that the pest control company tried to provide accommodation for her lupus by allowing her to work three days a week, Monday,

Wednesday, and Friday, so she would have a break between workdays.  Plaintiff stated that even with the spacing between days she was not able to recover enough to work every other day and transitioned to working only one day a week after five months on the modified schedule.  She worked one day a week for about one month and then stopped working altogether.  Plaintiff testified that her alleged date of disability, in May 2010, was about the time she transitioned to working three days a week.

Plaintiff said that increased pain in her hips, knees, and feet, beginning in the middle of May 2010, was the reason she began cutting back her work; she did not know at that time what caused her pain, but Dr. Gorman eventually diagnosed her with lupus.  Plaintiff reported that the following conditions also affected her ability to work: neuropathy in her legs, degenerative disc disease of the lower back, urinary retention,[21]

---

[21] Plaintiff treated with Matthew Stanizzi, M.D., of New England Urology for her urinary retention from September 8, 2011 through November 7, 2011.  Plaintiff was instructed on the procedure to catheterize herself on September 8 and told to perform the procedure intermittently twice a day.  On October 7, 2011, Plaintiff was referred for rehabilitation to retrain her pelvic floor muscles.  On November 7, Plaintiff phoned Dr. Stanizzi's office and stated "she [wa]s done with self-catheterization." Plaintiff was asymptomatic at the time and was told to self-catheterize if needed.

Raynaud's phenomenon in her fingers and toes,[22] and memory issues and pleurisy associated with her lupus.

Plaintiff takes HCQ for her lupus but she reported that none of her pain medications or steroids helped with the pain associated with lupus.  She testified that her pain level was a three out of ten at its lowest and a ten out of ten at its highest, when she could not even get up.  She reported that she has burning, tingling, and stabbing feelings from her neuropathy at least once a day for a couple of hours.  Plaintiff stated that she rotated the way she was sitting or standing to help relieve the neuropathy symptoms.  Plaintiff was diagnosed with degenerative disc disease in June 2011 and received plasma injections and physical therapy as treatment; although the treatments had worked "good" and been "helpful," plaintiff said surgery had not been ruled out.

Plaintiff testified that she needed to catheterize herself between 3 to 5 times a day, a 15-minute process, to treat for urinary retention.  She stated that she could spread those out evenly during the day, unless she felt that her bladder was full, but that she could not catheterize herself on a schedule.

---

[22] This phenomenon is an intermittent bilateral deficiency of blood in the fingers, toes, and sometimes ears, with severe paleness and often pain, usually brought on by cold or emotional stimuli and relieved by heat.  Dorland's, supra note 2, at 1430.

For her pleurisy, Plaintiff stated that she has chest pain and her left arm goes numb, which lasted anywhere from three minutes to two weeks.  She treated this condition with pain medication, an inhaler, and trying to relax.  Plaintiff reported her pleurisy was irregular and could be three times a week or only once a month.

Plaintiff stated that her lupus caused memory problems. For example, when driving home from work, she said she took a different exit due to traffic and then did not know where she was.  She reportedly "lost . . . what was even going on." She also reported that she forgets to put the car in park and leaves the car in gear and just shuts the car off.  Plaintiff stated that she missed appointments and had problems with dates and times, but she could not think of any examples when asked.  She reported that she needed reminders for her appointments, but used calendars, her phone, and calls from the doctor's office to help.

Plaintiff testified that she, her wife, and their four-year-old son live with plaintiff's brother, who supported her family because Plaintiff is out of work.  Plaintiff stated she was unable to play with her son for long periods and, when she did play with him, she needed to take a four-hour nap because of

pain and exhaustion.  She reported that she was able to sit for 30 minutes to an hour.  In terms of her pain, plaintiff testified she had no good days and three tolerable, "okay," days a week.

If her activity level was higher, plaintiff stated that she would have all bad days.  On a bad day, plaintiff said she needed help getting out of bed.  She tried to bathe on the bad days to lessen the pain.  After that, she would try to change positions, between sitting, standing, and lying down.  She said that getting down on the floor was the worst position for her and she could not "get down on the floor and play."  Plaintiff stated she had trouble focusing and did not watch movies because she lost track of what was happening.  On bad days, she took a four-hour nap and "pretty much [stayed] laying down," which was the most comfortable position.

Plaintiff reported she was able to stand for 30 to 60 minutes at a time.  She stated that she could walk to a store three blocks from her house, there and back, but would need to sit or lay down for a couple of hours after that exertion. Plaintiff testified that she was able to do minimal chores around the house; she reported that she could sweep the kitchen and do the dishes, but she did not cook, beyond simple things,

because she could not stand in one position for long.  She said that she was not able to clean any more than one room per day and would need to take a break and lay down after cleaning one room.  She said that she was not able to take out the trash and there was no yard work to do, as she lived in an apartment.

Plaintiff reported that her memory issues had been going on since her diagnosis with lupus, but seemed to be getting worse.  She said that she began having problems at work, remembering the steps of what to do.  Plaintiff said that she had trouble remembering conversations and had a hard time concentrating, on television shows and when playing cards with her son.

Plaintiff testified that her pain medications had not been effective with her joint and leg pain, which she had every day, "all the time."  She said that she had "gotten better control of" some of the side effects associated with her lupus as she knew not to push her limits.  When questioned, plaintiff responded that she felt a little better because she was aware of activities that she should avoid.  She stated that to feel better she needed to have a nap, avoid doing more than one thing at a time in the house, and keep her activity level low.

Plaintiff reported that she was receiving psychological treatment with Miriam Dunn from Harmony Counseling.  In her

25

therapy, she said she discussed the effects of lupus, her pain, how she deals with her pain, and the stressors in her life that can cause lupus to flare.  She said that the treatment had been "really good" for her and allowed her to discuss feelings she could not discuss outside of therapy.  She also reported taking an anti-depressant, Celapram.[23]

As to her ability to work, Plaintiff testified that she would not be able to do a "simple job" where she could sit and stand as she pleased because after a short period of time she would need a nap and she would need to self-catheterize, which she would need to do one to three times in an eight-hour day. She stated that if she worked a full day, she would not be able to get out of bed the following day and it could take several days to recover from working a full day.  Plaintiff reported that she struggled with no longer being able to be physical and be employed.

C.  **ALJ's Decision**

ALJ D'Alessandro applied the regulatory sequential evaluation process for evaluating DIB and SSI claims.  At step one, the ALJ found that plaintiff had not engaged in substantial gainful

---

[23] This is a trade name for citalopram hydrobromide, a selective reuptake inhibitor (SSRI), used to treat depression.  Dorland's, supra note 2, at 366.

activity since May 1, 2010.  At step two, the ALJ found that plaintiff had the following severe impairment: systemic lupus erythematous.  At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments in the Commissioner's Listing of Impairments.  See 20 C.F.R. pt. 404, subpt. P, app. 1. The ALJ then found that plaintiff had the RFC to perform "light work . . . except she can never climb ladder[s], ropes, and scaffolds.  [Plaintiff] can occasionally perform all other postural activities.  She should avoid all exposure to heights."  At step four, the ALJ found that plaintiff was capable of performing her past relevant work as a fast-food manager, which does not require the performance of work-related activities precluded by her RFC. Accordingly, the ALJ concluded that plaintiff was not disabled under the Social Security Act.

## II.   **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner.  My review "is limited to determining whether the ALJ used the proper legal standards and found facts [based] upon the proper quantum of evidence."  Ward

v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).

Findings of fact made by the ALJ are accorded deference as long as they are supported by substantial evidence.  Id. Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion."  Id. at 770.  Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence in the record.  Irlanda Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

### III.  ANALYSIS

Estabrook argues that the ALJ erred by failing to (1)

classify her mental impairments as severe at step two; and (2)
assign appropriate weight to her treating physician's physical
impairment evaluation.   I address each argument in turn.

**A.   <u>Mental Impairment</u>**

Estabrook first attacks the ALJ's opinion for failing to
classify her mental impairments as "severe" at step two.   I do
not need to resolve this issue.   Any error at step two would be
harmless in this case because the ALJ found another impairment
"severe" and therefore continued his analysis.   See McDonough v.
U.S. Soc. Sec. Admin., 2014 DNH 142, at 27.   In evaluating
Estabrook's residual functional capacity ("RFC"), the
ALJ "must consider limitations and restrictions imposed by all
of an individual's impairments, even those that are not
'severe.'"   Id. at 28 (quoting Stephenson v. Halter, 2001 DNH
154, at 5); see 20 C.F.R. § 404.1545(a)(2).

The issue is therefore whether the ALJ properly analyzed
Estabrook's mental impairment in his evaluation of her RFC.   In
determining RFC, the ALJ must consider all of a claimant's
medically determinable impairments, including those that are not
"severe."   20 C.F.R. § 404.1545(a)(2).   The ALJ considers the
claimant's "ability to meet the physical, mental, sensory, and
other requirements of work."   20 C.F.R. § 404.1545(a)(4).   For

mental impairments, this means the ALJ should consider
"limitations in understanding, remembering, and carrying out
instructions, and in responding appropriately to supervision,
co-workers, and work pressures in a work setting." 20 C.F.R. §
404.1545(c).

When there is inconsistency in any of the evidence in the
case record, the ALJ must weigh the relevant evidence. 20
C.F.R. § 404.1520b(b). The ALJ's review includes "objective
medical evidence," "other evidence from medical sources,
including their opinions," and "statements by the individual and
others about the impairment(s) and how it affects the
individual's functioning." SSR 06-03p, 2006 WL 2329939, at *1
(Aug. 9, 2006). The Social Security Administration divides
"medical sources" into "acceptable medical sources" and "other
sources." Id. at *2. Only "acceptable medical sources" can
establish a medically determinable impairment, provide medical
opinions, and be considered treating sources. Id. "Other
sources," however, can offer opinions reflecting their judgment
about some of the same issues. Id. The weight given to "other
source" opinions is case-specific, and the ALJ's decision should
be "based on a consideration of the probative value of the
opinions and a weighing of all the evidence in that particular

30

case." Id. at *5.

The ALJ determined that Estabrook had an RFC to perform "light work,"[24] "except she can never climb ladder[s], ropes, and scaffolds.  [She] can occasionally perform all other postural activities.  She should avoid all exposure to heights."  Tr. at 22.  Regarding mental impairments, the ALJ concluded that Estabrook had a medically determinable impairment of depression.  Tr. at 20.  He concluded, however, that her mental impairments did not limit her ability to work during the relevant period.  Tr. at 24.

The ALJ's determination that Estabrook's mental impairment was not limiting is supported by substantial evidence.  He noted that during the period, Estabrook "sought minimal mental health treatment, and was consistently noted to exhibit normal attention, concentration, mood, and affect."  Id.  Furthermore,

---

[24] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967(b).

he noted that Estabrook denied "experiencing any mental health symptoms" during a medical visit in 2011.  Tr. at 25.

Estabrook argues that the ALJ failed to accord sufficient weight to the opinion of her therapist, Miriam Dunn, who opined that Estabrook had poor or no work ability in the following: "ability to remember work procedures, understand short instructions, make simple decisions, complete a normal workday, and deal with normal work stress[,] among others."  Tr. at 25. The ALJ accorded Dunn's opinion "very limited weight."

Dunn is not considered an "acceptable medical source."  As a result, Dunn cannot establish a medically determinable impairment or provide a medical opinion.  Nonetheless, the ALJ may consider Dunn's opinion.  The weight the ALJ accords Dunn's opinion should reflect factors such as her relationship with Estabrook, how consistent her opinion is with other evidence, the degree of supporting evidence provided, how well she explained the opinion, her specialty, and any other factors that tend to support or refute her opinion.  See SSR 06-03p, 2006 WL 2329939, at *4-5 (Aug. 9, 2006).

After weighing the relevant evidence, the ALJ concluded that Dunn's opinions should be accorded very limited weight because they were inconsistent with substantial evidence in the

record.  The ALJ noted that "all objective evidence" showed that
Estabrook had a normal mental status throughout the relevant
period.  Tr. at 25.  Specifically, Dunn's own treatment notes
showed that Estabrook's mood, affect, thought process, behavior,
and functioning were all "unremarkable" during their treatment
sessions.  Tr. at 25 (citing Tr. at 795-99).  Additionally, the
ALJ noted Estabrook's own denial of mental health symptoms in
late 2011.  Because of the inconsistency of Dunn's opinion with
the rest of the evidence, the ALJ was entitled to accord very
limited weight to her opinion.

**B.**   **Dr. Guiry's Opinion**

Estabrook also argues that the ALJ erred by assigning
"little weight" to her treating primary care physician's
opinions.  She argues that the opinions of her primary care
physician, Dr. Guiry, "are consistent only with a finding that
Ms. Estabrook met her burden of showing that she is 'disabled.'"
See Doc. No. 10-1, at 13.

Generally, the ALJ must give controlling weight to a
treating source's opinion if it is "well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in [the]
record."  20 C.F.R. § 404.1527(c)(2).  If, however, the ALJ

finds that the treating physician's opinion is inconsistent with other substantial evidence in the record, the ALJ will instead consider the treating physician's opinion along with the other medical opinions in the record, weighted according to certain factors, including: the length, nature, and extent of the source's relationship with the claimant; the supportability of the opinion; the consistency of the opinion with the record as a whole; the source's specialization; and any other factors which tend to support or refute the opinion.  See 20 C.F.R. § 404.1527(c).

Where a treating source provides multiple opinions over the course of the relevant period and does not explain material differences among them, the ALJ is not in a position to give controlling weight to any of those opinions.  See 20 C.F.R. § 404.1527(c)(2).  In cases where multiple treating physicians offer materially inconsistent opinions, the ALJ must resolve those inconsistencies.  See Watkinson v. Colvin, 2013 DNH 161, at 5 n.2 (ALJ did not err in resolving contrary opinion evidence from multiple treating physicians).  The same principle applies here where one treating physician offers multiple opinions that are inconsistent.[25]  See Cruze v. Chater, 85 F.3d 1320, 1325 (8th

---

[25] Although claimant provides a plausible explanation in her

Cir. 1996) (according limited weight to inconsistent statements from a single treating physician). The resolution of these conflicts in evidence is the province of the ALJ. See Irlanda Ortiz, 955 F.2d at 769.

Regarding Estabrook's physical exertion limits, Dr. Guiry's three opinions were inconsistent with each other. Dr. Guiry's November 2010 and April 2011 opinions state that Estabrook could sit, stand, and walk for a maximum of one hour each per day, but her December 2011 opinion states that she can sit and stand for four hours each per day. See Tr. at 87 (November 2010), 90 (April 2011), 613 (December 2011). Dr. Guiry does not provide an explanation for this material change. Given the inconsistency, the ALJ need not give controlling weight to the opinions and should give more weight to an opinion that is more consistent with the record as a whole. See 20 C.F.R. § 404.1527(c)(4). On the issue of physical exertion, the ALJ found that Dr. Guiry's December 2011 opinion was more consistent with the record as a whole. Specifically, the ALJ concluded that the objective evidence showed Estabrook had full strength in her extremities, no swelling or joint tenderness, normal

---

brief that her condition changed over time, there is no evidence that Dr. Guiry observed such a change or that a change in condition was the basis for the changes in her opinion.

gait, no weakness, the ability to heel and toe walk without pain or difficulty, full range of motion of the back, and normal finger dexterity, which were all inconsistent with a limited ability to stand, walk, and sit.  Therefore, the objective evidence was more consistent with the physical exertion limits listed in Dr. Guiry's December 2011 opinion than in her prior two opinions.

Regarding Estabrook's ability to use her hands for grasping, turning, or twisting objects, Dr. Guiry's opinions were also inconsistent.  Dr. Guiry's November 2010 and April 2011 opinions state that Estabrook could "occasionally" use her hands to grasp, turn, and twist objects.  Tr. at 88, 91.  Dr. Guiry's December 2011 opinion states that Estabrook could "never" use her hands for those purposes.  Tr. at 614.  Again, it is the province of the ALJ to resolve this inconsistency. See Irlanda Ortiz, 955 F.2d at 769.  The ALJ noted that Estabrook denied any neuropathy pain in January 2011 and that Estabrook stated that Gabapentin was working very well to control her symptoms.  Tr. at 23, 25 (citing Tr. at 769). Further, the ALJ pointed to Estabrook's reported activities of cooking, cleaning, and chasing her 3-year-old child as evidence inconsistent with having no ability to use her hands to grasp,

turn, and twist objects.

Although the record also contains evidence supporting Estabrook's allegations of physical impairments, it is the ALJ's role, not mine, to weigh and resolve conflicts in the evidence. See Rodriguez, 647 F.2d at 222 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  Here, the ALJ's decision in assessing the medical opinions and other evidence is supported by substantial evidence.


### IV.   CONCLUSION

For the foregoing reasons, I grant the Commissioner's motion to affirm (Doc. No. 11) and deny Estabrook's motion to reverse (Doc. No. 10).  The clerk is directed to enter judgment accordingly and close the case.

SO ORDERED.


                              /s/Paul Barbadoro
                              Paul Barbadoro
                              United States District Judge


October 21, 2014

cc:   Karl E. Osterhout
      Daniel McKenna
      Robert J. Rabuck